Filed 2/24/14  In re David G. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re David G., a Person Coming Under the Juvenile Court Law. | |
| | D064198 |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. SJ11431; SJ11431D) |
| v. | |
| S.C. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant, S.C.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant, David G., Sr.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy Counsel Counsel, for Plaintiff and Respondent.

Tilisha Martin, Carolyn Levenberg, Maria Diaz for the Minor.

S.C., the mother of David G., appeals from a juvenile court judgment terminating her parental rights to David following her Welfare and Institutions Code[1] section 366.26 hearing and denying her an evidentiary hearing on her section 388 petition for modification. She contends the juvenile court erred by (1) declining to apply the beneficial relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) and (2) denying her section 388 petition without an evidentiary hearing regarding her enrollment in a residential drug treatment program and compliance with its requirements. David G., Sr., David's father (father) appeals and joins in S.C.'s arguments to the extent they benefit him. He also challenges the sufficiency of the evidence supporting the social worker's conclusion that he and David did not have a secure bond. David's counsel joins in the arguments and position of the San Diego County Health and Human Services Agency (Agency). We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2012, Agency petitioned under section 300, subdivision (b) on behalf of David, alleging that S.C. failed to adequately supervise or protect David. Specifically,

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

Agency alleged S.C. had been arrested after attempting to sell methamphetamine while David, who was then eight months old, was unattended in a motel room with methamphetamine and drug paraphernalia within his reach. It alleged S.C. admitted to a history of methamphetamine use, she had failed to reunify with three other children, and David was at substantial risk of serious physical harm or illness.

After her arrest, S.C. was booked into Las Colinas Women's Detention Facility. David was taken to Polinsky Children's Center and two days later moved to a licensed foster home. Social worker James Marcuzzo then met with S.C. He reported S.C. had previously received case management, counseling, substance abuse treatment and education about the danger of exposing her children to poor environments and behaviors, but continued to surround herself with criminal activity, engage in drug use and live in environments where her children could ingest methamphetamine. He also separately interviewed father, who admitted he had used methamphetamine or heroin on the morning of his interview. Father's January 9, 2012 drug test was positive for opiates, codeine, and morphine.

On January 11, 2012, the court determined father to be the presumed parent. It declined to grant David detention with father given father's drug use, but granted S.C. and father liberal supervised visitation.

In February 2012, Agency recommended that father be provided reunification services, but that S.C., who had failed to protect David and was determined to be a substantial risk, be denied such services. A social worker had supervised a visit at the Las Colinas Detention Facility with S.C. and David on February 9, 2012, and reported

3

that David's initial reaction to S.C. was passive; he did not react or easily go to her as she reached out for him, and he did not acknowledge that she was someone familiar. S.C. was tearful and had difficulty managing her emotions, but David tolerated the visit while engaging in minimal eye contact with S.C. S.C. was able to provide one nurturing moment while she fed David and he touched her face, and she appropriately played with him. Nevertheless, the social worker concluded it was unclear if S.C.'s visit was beneficial to David given his initial nonreaction as well as his ease in separating from S.C. after the visit. Agency reported that S.C. had an extensive history of drug use that led to her other three children being removed from her custody, and termination of her parental rights as to the youngest of her other children in August 2006.[2] S.C. also had a criminal history due to her dependence on controlled substances and involvement in drug sales leading to arrest. S.C.'s history demonstrated her inability to put her children's needs ahead of her own.

On March 6, 2012, the court entered true findings on the petition and ordered David placed in foster care. It denied S.C. reunification services. S.C. was released from jail in April 2012 but as of the end of August 2012, had no contact with Agency. In June

---

[2]     Agency requested, and the juvenile court implicitly took, judicial notice of documents filed in the dependency case of David's half-sibling, E.C., to whom S.C.'s parental rights were terminated. On that evidence, the court denied reunification services to S.C. under section 361.5, subdivision (b)(10) (parent's failure to reunify with sibling) based on S.C.'s failure to reunify with E.C.

2012, David was placed with nonrelative extended family members (§ 362.7[3]) who were maternal cousins.

The six-month review hearing took place in October 2012. In a September 4, 2012 status review report, social worker Michelle Paje reported that father began individual therapy in February 2012 but according to his therapist, as of July 2012 he was still inconsistent in his insight and in verbalizing the negative consequences of his drug addiction to himself and David. Father also struggled with his coping skills. Father had missed four appointments with the therapist. He had not seen the therapist since July 12, 2012, and had not called to reschedule. Father began substance abuse treatment on January 27, 2012, but tested positive for methamphetamine and heroin on March 6, 2012, and April 24, 2012. After completing a detoxification program in May 2012, he had two unexcused absences from his substance abuse treatment group and was not checking in for drug testing. In July 2012, father walked out of a treatment group and refused a drug test, after which he was referred to inpatient drug treatment. That month, Father was discharged from the substance abuse treatment program for excessive absences. Paje later reported that father admitted using methamphetamine in early September 2012, but he had entered the CRASH (Community Resources and Self Help) program, an inpatient drug rehabilitation program, on September 27, 2012. Father also asked to resume therapy.

---

[3] " 'A "nonrelative extended family member" is defined as any adult caregiver who has an established familial or mentoring relationship with the child. . . . The parties may include relatives of the child, teachers, medical professionals, clergy, neighbors, and family friends.' " (*Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 108.)

Paje reported that Father began supervised weekly visitation with David in February 2012 and was appropriate with David; feeding him and changing his diaper during visits. During the visits David looked to father for his needs. However, father did not show up for four visitation sessions between April 2012 and June 2012, did not call to inform the visitation center, and his referral was closed in June for exceeding the center's "no show" policy. Father otherwise had seven visits with David's then foster mother between April and June 2012. After David was placed with the extended family members in June 2012, father had one supervised visit in July 2012. He failed to appear at another scheduled visit and they rescheduled another, but as of July 27, 2012, father had neither called for visitation nor contacted the family member to check on David's well-being. Though father had completed a parenting education class, Paje concluded that father had not demonstrated he could safely care for David as his drug use impacted those abilities, father minimized his drug use and did not understand its negative ramifications, and David was not safe in father's care. She recommended that services be terminated and a section 366.26 hearing set.

As for S.C., Paje reported S.C. had met with her probation officer on April 12, 2012, and was not aware she was entitled to visitation. The probation officer stated S.C. had tested positive for methamphetamine that day and the next day. S.C. admitted using drugs again on April 23, 2012, at which time she was admitted to the substance abuse recovery program at McAllister South Bay Regional Recovery Center. S.C. tested positive for drugs again on April 26, 2012, but had four negative drug tests in May 2012.

6

Her progress at the center was reported to be unsatisfactory, however, for unexcused absences. S.C. stopped attending the program on June 4, 2012.

Paje was informed by the nonrelated extended family member with whom David was placed that on June 21, 2012, S.C. had entered CRASH. S.C. had three supervised visits in May and June with David's then foster mother but S.C. was not consistent in calling to set up visits. Paje reported that S.C. had been having visits each Sunday with David at CRASH, as the extended family member could not transport David to her on the only other visitation day. S.C. dropped out of CRASH on September 11, 2012, and the program would not accept her back due to past incidents and her inability to remain in treatment.

Adopting the recommendations in the status report, the court in October 2012 terminated father's reunification services and set a section 366.26 hearing. It found David's return to father would create a substantial risk of detriment to David's physical and emotional well-being, and there was not a substantial probability he would be returned to father's physical custody within the next six months.[4]

Agency issued assessment reports in January and February 2013 for the section 366.26 hearing, as well as an addendum in March 2013 in part responding to the parties' petitions filed under section 388. In January 2013, David was one year old, in good health, and up to date on his immunizations. He appeared to be attached to his foster

---

4     Father filed a notice of intent to file a petition for a writ of mandate in this court challenging the juvenile court's October 11, 2012 order, but the case was dismissed after his attorney advised there were no viable issues for writ review.

parents and looked to them to meet his needs, and they had met his physical, developmental, emotional and medical needs for the past seven months. They had coordinated speech therapy for David, were willing to access additional services, and had assisted with visitation by transporting David and supervising visits when needed. The foster parents were in the process of deciding whether to adopt David. David had limited vocabulary and was unable to articulate any feelings, but he appeared attached, comfortable and content when interacting with both foster parents.

David had not lived with father since the fall of 2011, and though father was entitled to weekly visitation, he had not been consistent in them. For example, father did not appear for three out of four weekly visits he had scheduled between September 11, 2012, and October 2, 2012. In reporting on five supervised visits between father and David, social worker Jennifer Kadas reported that during the first visit, David did not have any reaction to seeing him. Father played with David and changed his diaper even though it was clean. When the visit was over, David began to make an upset face when father left, but became calm when driving with Kadas. On one visit, father brought toys and a bib, but otherwise he did not bring toys, food or diapers. Kadas observed father comforted David and was affectionate but did not consistently set limits, including by failing to have David put a toy away at the end of a visit. Kadas observed that David did not use the word "daddy." She stated that while David appeared to enjoy the time with father and father showed some positive parenting practices, she did not believe David was securely attached to father due to the inconsistent environment during the first eight months of David's life and father did not consistently set limits, which was a fundamental

8

parenting practice. Kadas concluded that while David and father had a relationship, it was not strong.

Kadas reported that she was contacted by S.C. in November 2011 to set up supervised visits and had left multiple messages for S.C. and her substance abuse counselor at KIVA, an inpatient drug treatment program, without being able to set up times during the week. Kadas eventually supervised one visit between David and S.C. in December 2012, for which S.C. was late. When S.C. arrived, she got David out of the car seat and carried him inside, but David did not have a noticeable reaction to her. S.C. sat David in her lap to read but David got up and went to his baby foster sister, after which time the foster father redirected David to another activity. S.C. picked up David and made noises that made him laugh, and told him she loved him. David did not have a noticeable reaction when the visit ended. Kadas reported that since she was assigned to the case, S.C. was visiting David weekly and had approximately 11 visits with David. Nevertheless, Kadas concluded that while David enjoyed his visits with S.C. and she showed some positive parenting skills, S.C., like father, did not consistently set limits with David and the child listened to his foster father when given the same direction. According to Kadas, S.C.'s visits, which had been consistent since June 2012, were more like those with an extended family member and not a securely attached parent. Kadas did not believe David was securely attached to S.C. due to her active addiction at the time of his removal, and they did not have a strong relationship.

Kadas believed adoption was in David's best interest; that both parents had substance abuse histories spanning about 15 years with a long way to go in the recovery

9

process before they were stable and could safely care for a young child, and David could not wait any longer for them to stabilize. She concluded the benefits of adoption outweighed any potential detriment and there would be no significant detriment to David if his relationship with S.C. were severed.

In an addendum, Kadas reported she had supervised one additional visit with S.C. in January 2012. During that visit, David did not initially want to go to S.C., and when he later became upset during play, he reached out to Kadas. David was not bothered when S.C. left. Kadas's conclusions as to a permanent plan of adoption for David had not changed; she did not believe David had a significant parent-child relationship with either parent and the benefits of adoption outweighed any potential detriment.

On March 12, 2013, father filed a section 388 petition requesting reinstatement of his reunification services and unsupervised visitation or alternatively an order for a plan to transition David back to him. Father asserted he had completed an intensive behavioral modification drug treatment program involving drug and alcohol counseling, group therapy, parenting, drug testing, 12-step meetings, transitional services, and an after-care program. He claimed he was participating in volunteer opportunities with CRASH, had a sponsor, continued to attend Narcotics Anonymous meetings, was looking for stable employment, and had completed a relationship class. Father stated he accepted responsibility for his past drug use and could identify triggers that caused him to use, helping him to maintain his sobriety. Father pointed to Kadas's February status report and addendum, claiming it showed his visitation with David was more consistent and he

acted appropriately during visits, comforting and showing affection to David, changing him, feeding him, and redirecting him when needed.[5]

In her March 14, 2013 addendum, Kadas reported that the nonrelated extended family members had decided to adopt David. The foster father told her that S.C. had cancelled a few visits and had been more distant; he believed S.C. was using drugs again. S.C. presented a letter of completion from KIVA, a drug and alcohol treatment program, showing S.C. had attended between October 3, 2012, and January 2, 2013. However, S.C.'s counselor reported to Kadas that on March 8, 2013, S.C.'s drug test was positive for methamphetamine, and S.C. had refused to test the prior day. S.C. had also been laid off her job. S.C. had asked the counselor not to tell Kadas about the positive drug tests. S.C.'s probation officer reported to Kadas that S.C. was living with father and using drugs, and that when she drug tested S.C., S.C. told her it would be positive for methamphetamine. As for father, Kadas reported he had completed the CRASH program on January 28, 2013. She had spoken to father's aftercare counselor, who had not seen father since February 28, 2013, and was dropping father from the program.

In a May 2013 addendum, Kadas reported that David had seen father once since February 2013. That visit was on Easter, March 31, 2013, at a family dinner, which

_____

5    In or about February 2013, S.C. also prepared a section 388 petition seeking reunification services and unsupervised visitation. She stated she had completed KIVA, a residential drug treatment program, and a parenting class, had a sponsor and was attending meetings. She stated she was visiting David regularly and was gainfully employed. S.C. claimed she had been clean and sober since June 21, 2012. However, S.C. later withdrew this petition on grounds she had "struggled recently with her sobriety" and had no basis for such a request.

according to the foster mother went well, but father's "attention span was different" and the foster mother suspected he was using drugs. The foster mother told Kadas that father was supposed to contact them for another visit but had not as of April 16, 2013. Kadas reported that she had not received any calls from father requesting assistance with visitation, but father told her on May 3, 2013, that he would set up a visit with David for that weekend. As for father's sobriety, father reported on May 3, 2013, that he had not used alcohol or drugs since leaving CRASH but was not enrolled in aftercare treatment, though that was considered part of the CRASH program. Father claimed it was difficult to keep in contact with his Narcotics Anonymous sponsor and had not spoken with him since his last court date on March 19, 2013. Father reported he had moved out of the shared residence with S.C. before her relapse.

Kadas reported that on April 16, 2013, the foster mother stated that S.C. had been calling to set up visits with David but S.C. was not showing up for them. The foster mother told Kadas that S.C. called father on Easter and asked about David; that S.C.'s last visit was on March 23, 2013, and she had not seen David in three or four weeks; S.C. was currently in a detoxification program; and the foster parents were trying to set up a visit with her. Kadas had not received any calls from S.C. with updates or to seek assistance in setting up visitation.

Observing that David had recently turned two and had been living out of his parents' care for about 16 months, over one-half his life, Kadas assessed adoption to be the most appropriate permanent plan for David. She found no exceptions to adoption

existed; she recommended the court order a permanent plan of adoption for David and termination of S.C. and father's parental rights.

In a June 7, 2013 addendum, Kadas reported that she had been given a counselor's letter stating that S.C. had entered KIVA, a residential drug treatment program, on April 17, 2013, and was a resident there as of May 15, 2013. By the time Kadas contacted KIVA with a release for the program to provide confidential information, S.C. declined permission for the KIVA counselor to talk to Kadas about her treatment. Kadas confirmed with S.C.'s counselor at McAlister Institute that S.C. was in an aftercare program in March 2013 where she had two positive drug tests; S.C. was then sent to 14 days of detoxification but used drugs while there; and S.C. was discharged in April 2013 with a poor prognosis " 'due to continued drug use' " after failing to appear on April 10 and April 11, 2013. Kadas did not change her recommendation as to David's permanent plan and termination of parental rights.

On June 10, 2013, two days before the section 366.26 contested hearing, S.C. filed a section 388 petition. She stated she had entered KIVA and asked that David be placed with her there as well as family maintenance services. Alternatively, S.C. asked that the court order reunification services to the 18-month review, or another permanent planned living arrangement be ordered with services under section 366.3. S.C. claimed that she raised David for the first nine months of his life and he "deserves the opportunity to be raised by his biological mother."

At the contested section 366.26 hearing, the juvenile court denied S.C.'s section 388 petition. It found S.C. had a long history of substance use and repeated failures in

13

substance abuse treatment, and there was no evidence to show KIVA would be a successful program for S.C., or why it would be in David's best interest to be raised by her. Observing S.C. had tested positive in March 2013, self-reported to be using in April 2013, and was not cooperative with Agency, the court ruled there was no evidence of a change in circumstances for S.C. and no prima facie evidence of David's best interest; short-term sobriety, therapy, and residential treatment did not provide such evidence. After considering arguments as to David's permanent plan, the court found it was "a stretch but possible" to find that there had been regular, consistent visits and regular contact with David, but that neither parent had shown that the quality of their visits constituted anything more than David seeing a friendly visitor; there was no evidence to suggest they established any parental role that would outweigh the benefits of permanent adoption for David. It found the benefits of permanent adoption for David far outweighed a relationship with S.C. and father, and by clear and convincing evidence that no exceptions applied, termination of parental rights was not detrimental to David, and adoption was in his best interest. It terminated S.C. and father's parental rights and referred David to Agency for adoption.

DISCUSSION

I. *S.C.'s Appeal*

A. *The Beneficial Relationship Exception*

    1. *Legal Principles and Standard of Review*

Neither party contests the court's finding that David is adoptable and that adoption is in his best interests. If a dependent child is adoptable, the court must terminate

14

parental rights at the section 366.26 hearing unless the parent proves by a preponderance of the evidence the existence of a statutory exception. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345 [parent bears the burden to establish by preponderance standard that an exception to the statutory preference for adoption applies].) An exception exists if a parent has "maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i), italics added.)

"This court has interpreted the phrase 'benefit from continuing the relationship' in section 366.26, subdivision (c)(1)(B)(i) to refer to a 'parent-child' relationship that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

To make this showing, "[a] parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . . The relationship arises from day-to-day interaction, companionship and shared experiences.' [Citation.] The parent must

15

show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; see also *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 [to establish a beneficial relationship, it is not enough that the parent "demonstrate 'frequent and loving contact[,]' [citation], an emotional bond with the child, or that parent and child find their visits pleasant"].) "One can know a child's interests, enjoy playtime together, and be a loved relative, but not occupy a parental role in the child's life." (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523, disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)

The existence of a beneficial relationship is determined by factors such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) We determine the exception's application on a case-by-case basis, and under the substantial evidence standard. (*Id*. at pp. 575-576.) Thus, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *Autumn H*., at p. 576.)

16

## 2. *S.C.'s Contentions*

S.C. contends "there is insufficient evidence to support the determination that [S.C.] did not meet her burden of showing a beneficial relationship." She maintains she had regular and consistent weekly visitation from the end of June 2012 to April 2013, thus meeting the first prong of the beneficial relationship exception, and that her contact with David was "appropriate and positive . . . ." S.C. relates the details of her supervised visit on February 9, 2012, while at Las Colinas, and other visits on December 18, 2012, January 29, 2013, and February 26, 2013, and asserts David was "comfortable and bonded" to her. Specifically, S.C. points out she played appropriately with David, reading to him and helping him select toys or making noises that made him laugh; had nurturing moments with him in that she held and spoke softly to him while he looked at her and touched her face; told him she loved him; fed him and changed his diaper; and kissed him goodbye. S.C. argues that because David's vocabulary was limited, his nonverbal cues were important, and those showed he enjoyed the visits he had with S.C. She also argues that there was no evidence her relationship with David was harmful, or that David's placement with the foster parents would have been jeopardized if her parental rights had remained intact.

## 3. *Analysis*

Though S.C. argues extensively that she maintained regular visits, and Agency contests the juvenile court's finding in S.C.'s favor on that first prong, we decide S.C.'s appeal on the second prong of the beneficial relationship analysis: whether substantial evidence supports the juvenile court's determination that S.C. had not shown a sufficient

17

parental role that "promotes the well-being of [David] to such a degree as to outweigh the well-being [David] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

At the outset, we note that the beneficial relationship exception is "difficult to make in the situation . . . where the parents have [not] advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) These are the circumstances in this case. On this point, S.C.'s arguments at best establish loving or pleasant visits, which is not sufficient to establish a beneficial parent-child relationship. S.C. selectively points to social worker Kadas's conclusions that she showed positive parenting practices. But these arguments ignore Kadas's other conclusions that David did not recognize S.C. or go easily to her during visits, he responded to the foster father when redirected, did not have an emotional response to leaving S.C., and ultimately responded negatively when seeing her at visits, instead seeking comfort from Kadas. S.C. ignores Kadas's conclusions that based on these behaviors, and also the fact S.C. was active in her addiction when David was removed from her, S.C. and David did not share a strong or secure relationship. And, Kadas's report indicates David was thriving with his foster parents, who were meeting his emotional and other needs. Social worker Kadas's reports and expertise, as reflected in her resume admitted into evidence, constitute substantial evidence on which the juvenile court was entitled to rely. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53 [trial court was entitled to find the social worker credible and to give greater weight to her assessments].) The evidence from Kadas's reports permit an inference that S.C. was at best a friendly caretaker or visitor to David. We will not

18

reweigh the inferences to be drawn from the evidence to favor S.C. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947 ["we draw all reasonable inferences in support of the findings"].)

B. *S.C.'s Section 388 Petition*

S.C. contends she met her prima facie burden to trigger an evidentiary hearing on her section 388 petition, and that the juvenile court violated her due process rights by dispensing with a hearing and summarily denying the petition.

1. *Legal Principles*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.] The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child. [Citation.] Generally, the petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought. [Citation.] [¶] Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citation.] In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citation.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611-612.)

19

The petitioner must "make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 310.) There are two parts to the prima facie showing: The petitioner must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the child. (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 529.) The petition, which is to be liberally construed (*In re Marilyn H.*, at p. 309), must be verified and "set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." (§ 388, subd. (a)(1); *In re Edward H*. (1996) 43 Cal.App.4th 584, 593 [section 388 petition must include "specific allegations describing the evidence constituting the proffered changed circumstances or new evidence"].) The court is given broad discretion to deny a hearing if the request for modification fails to state a change of circumstances or new evidence or fails to demonstrate that the requested modification is in the best interests of the child. (Cal. Rules of Court, rule 5.570(d)(1) & (2); *In re Stephanie M*. (1994) 7 Cal.4th 295, 318 [decision whether to change an existing order is committed to juvenile court's sound discretion]; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642; *In re Zachary G*. (1999) 77 Cal.App.4th 799, 807-808.)

2. *Analysis*

Under the applicable standard of review, the court's summary denial of a hearing on S.C.'s modification petition "should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Such error is shown only where the court

20

exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination.  (*In re A.S.*, at p. 358.)  S.C.'s showing does not meet this standard.

S.C. claims her circumstances had changed because she was presently enrolled in KIVA and was participating in individual mental health therapy sessions.  Her section 388 petition included documentation that she was then attending classes and workshops.  But S.C. had not completed the program, and her placement there must be viewed in the light of her repeated efforts at substance abuse treatment and relapses over her years of substance abuse.[6]  Indeed, S.C. resumed her drug use after her release from jail in April 2012.  She failed to complete CRASH in 2012, and though she enrolled in another program in January 2013, she tested positive again in March 2013 and was deceptive about it, asking her counselor to conceal the test results from Agency.  Under these circumstances, the juvenile court reasonably concluded that S.C. had shown at best *changing* circumstances, which do not meet the prima facie showing under section 388.  (*In re A.S.*, *supra*, 180 Cal.App.4th at p. 358; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)  S.C.'s participation in this program and individual therapy is not enough to establish changed circumstances.  (Accord, *In re Marcelo B.*, *supra*, 209 Cal.App.4th at pp. 641-642 [participation in 12-step meetings insufficient evidence of changed circumstances to warrant a hearing on section 388 petition because father already received extensive alcoholism treatment with no improvement]; *In re A.S.*, *supra*, 180

---

6    In her March 14, 2013 addendum report, Kadas related that S.C., who was then 36 years old, had begun using drugs when she was 19 years old, and had completed substance abuse treatment programs in 2008 and 2009.  S.C. relapsed on methamphetamine shortly after David was born and failed to complete CRASH in 2012.

21

Cal.App.4th at p. 358 [completion of parenting class and participation in individual counseling insufficient to require evidentiary hearing on section 388 petition].)

Further, S.C.'s petition made no showing of how David's best interests would be served by depriving him of a permanent, stable home in exchange for an uncertain future. (See *In re Jackson W.* (2010) 184 Cal.App.4th 247, 260, in part citing *In re J.H.* (2007) 158 Cal.App.4th 174, 182-183 [children need stability and permanency, not protracted legal proceedings that prolong uncertainty for them].) S.C. relies on the existence of a beneficial relationship between her and David, but the evidence, as related above, was lacking on that point. The sole assertion made in S.C.'s petition was that it was in David's best interest to be raised by his biological mother. This assertion is not enough: " '[T]he presumption favoring natural parents by itself does not satisfy the best interests prong of section 388.' " (*In re Jackson W.*, at p. 260.) Because the liberally construed allegations would not have sustained a favorable decision on the section 388 petition, S.C. was not entitled to an evidentiary hearing and was not denied due process.

## II. *Father's Appeal*

Joining in S.C.'s arguments, father contends the juvenile court erred in finding the benefits of adoption outweighed his bond with David. Specifically, he points out he lived with and supported David for almost all of the first seven months of David's life; he had appropriate weekly visits with David after David's removal from S.C. during which he fed, changed and played with David; he maintained his weekly visits after he entered the drug treatment program in September 2012; he made great efforts to comply with treatment services in order to reunify with David; and he continued his weekly visits,

22

missing only a few, through the permanency planning hearing. Father asserts the visits appeared beneficial and his therapist noted he had a good relationship with David and was able to see to his needs. Based on this evidence, father argues the social worker's conclusion that he did not have a secure bond with David is not supported by substantial evidence. S.C. joins in these arguments.

Setting aside the first prong of the beneficial relationship exception, we conclude father's showing suffers from the same deficiencies as S.C.'s. That is, father relates the evidence favorable to him, and ignores the social workers' reports showing he was unable to set limits and did not provide food, toys or diapers for David for the vast majority of his visits. His recitation of the evidence ignores the social worker's observation that David had no reaction to seeing him during visits, and easily separated from him. Father does not acknowledge Kadas's conclusion that due to the chaotic environment in which David spent the first few months of his life and inconsistency in father's visits, David was not securely attached to father. Like S.C., father's contacts with David never went beyond supervised visitation. Father does not relate evidence showing the requisite "substantial, positive emotional attachment" between him and David. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Nor, in view of the evidence that David was thriving with his foster parents, has father demonstrated how David would be greatly harmed if his relationship with father was terminated. (*In re Autumn H.*, at p. 575.) The social workers' reports and addenda, on which the juvenile court was entitled to rely, constitute substantial evidence that father's relationship with David was at best loving and pleasant, but that he and David had no

23

strong parent-child bond.  In sum, father has not shown the beneficial relationship exception to adoption applies.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

AARON, J.